Edward A. **HABER**, Robert H. Moen, Ronald P. Tamillo, John Winning and Robert D. Sisson, Appellants,

v.

The **AMERICANA CORPORATION**, a corporation, Appellee.

Nos. 20711–20714.

United States Court of Appeals Ninth Circuit.

May 15, 1967.

Loeb & Loeb, Los Angeles, Cal., Gustav C. Wilbert, Downey, Cal., Robert A. Holtzman, Los Angeles, Cal., for appellants Edward A. Haber, Robert H. Moen and Ronald P. Tamillo.

H. Ronald Hauptman, Los Angeles, Cal., for appellant Alvin Seidenberg.

Robinson & Wolas, Herbert Wolas, Los Angeles, Cal., for appellant Robert Kalmus.

Barbara Warner, Melville H. Nahin, Los Angeles, Cal., Arnold Humble, Arcadia, Cal., for appellee.

Before BARNES and JERTBERG, Circuit Judges, and HALBERT,* District Judge.

BARNES, Circuit Judge.

Separate actions were initiated by Edward A. Haber, Robert H. Moen, Ronald P. Tamillo and John Winning, appellants in No. 20711, Robert D. Sisson, appellant in Nos. 20711 and 20712; Alvin Seidenberg, appellant in No. 20713 and Robert Kalmus, appellant in No. 20714, to recover unpaid overtime compensation. The four cases were consolidated for trial in the District Court, and have been consolidated in this court for the purpose of this appeal.

Appellants are all former employees of appellee Americana Corporation. They brought suit against their former employer under the Fair Labor Standards Act for unpaid overtime compensation, jurisdiction of the district court being under 28 U.S.C. § 1337. Americana counterclaimed for misappropriation and conversion of its property, jurisdiction of the counterclaim being under 28 U.S.C. § 1332(a) (1). We have jurisdiction of the appeal under 28 U.S.C. § 1291.

Americana Corporation's principal product is the Encyclopedia Americana which is sold in sets by salesmen throughout the country. In its Beverly Hills office Americana maintained a collection department to stimulate collections on accounts receivable. During 1963 and early 1964 appellants were employed in the collection department in various capacities. Some of appellants were telephone men, whose job was to call persons whose accounts were delinquent and urge payment. Other appellants were "area supervisors", whose functions, inter alia, included supervision of telephone men in their area. Americana operated on a standard 37½ hour work week, for which appellants were compensated at a flat monthly rate, regardless of hours worked. Appellants were also able to earn "bonuses" if they collected fifty-one per cent or more of the accounts assigned to them on a monthly basis.

Many of the employees in the collection department were engaged in one or more

* Sherrill Halbert, United States District Judge for the Eastern District of California, sitting by designation.

schemes to defraud the employer. One such scheme took the form of employees purchasing 1963 sets of the encyclopedia and paying for an out-of-date 1958 set. The 1963 set then would be sold by the employee to a third party at a profit. Another scheme involved collecting, through a dummy organization, long dormant accounts where the employees would retain the proceeds. A third scheme involved falsification of company records so that employees would be paid bonuses which were not in fact earned. The losses from these nefarious enterprises are the basis for Americana's counterclaim.

The court below found that appellants had been adequately compensated for their overtime work. It also found that three appellants, Haber, Ronald Tamillo and Winning, as "area supervisors" were within the "administrative capacity" exemption for the overtime requirements of the Fair Labor Standards Act. Finally, the court found that five of the appellants had conspired against Americana and rendered a judgment against them and in favor of Americana in the amount of $77,400. These three findings are challenged here.

### I. *Overtime Payments*

The district court, as noted, found that each of the appellants had been adequately compensated for overtime. The evidence supporting that finding is the testimony of Mr. Keleman, a certified public accountant. Mr. Keleman explained his approach thoroughly (R.T. pp. 1257–58), and further explained it on voir dire (R.T. pp. 1262–74). His method was to take the monthly salary and multiply by 12 to get the yearly wage. The yearly wage was divided by 52 to find the weekly pay, which was divided by 37½ to obtain the regular hourly rate. This is substantially the procedure required by 29 C.F.R. § 778.113(b). At point, however, is the treatment of the "bonus" payments.

Mr. Keleman in his calculations used only the monthly salary to find the regular rate of pay. He then treated the "bonus" payments as compensation for overtime to arrive at his conclusions as to the adequacy of the compensation of individual appellants. In this he was in error. The Act requires the regular rate to include "all remuneration for employment". 29 U.S.C. § 207(d). Excluded therefrom are certain items, §§ 207(d) (1) and (3) (a) being relevant here. Section 207(d) (1) excludes gifts made on special occasions the amounts of which are not dependent upon hours worked, production or efficiency. The present situation is not within that provision since the employees had to achieve a certain level of efficiency to get a bonus, and such bonuses were paid regularly rather than on special occasions. Section 207(d) (3) (a) applies only if the fact that the payment is to be made and the amount are in the sole discretion of the employer. Here a fixed level of performance determined whether or not a bonus was paid, not the discretion of the employer. Not being excluded, the bonus payments should have been included in calculating the regular rate of appellants' compensation, and should not have been treated as overtime compensation.[1]

The accountant's conclusions as to adequate remuneration were erroneous because based on incorrect treatment of "bonuses", if for no other reason. As the court's findings were based on these conclusions, they too were erroneous, and must be reversed.

### II. *Administrative Capacity*

Excluded from the time-and-one-half provisions of the Fair Labor Standards Act is "any employee employed in a bona fide executive, administrative, or professional capacity * * * (as such terms are defined * * * by regulations of the Secretary, * * * ) * * * " 29 U.S.C. § 213(a) (1). The Secretary has provided, in 29 C.F.R. § 541.2, five criteria which must be met to

---

1. The bonus payments really amounted to commissions. As such we would reach the same result. 29 C.F.R. § 778.117.

qualify under the administrative exemption of 29 U.S.C. § 213(a) (1). One of these (29 C.F.R. § 541.2(d)) is that no more than twenty per cent of the employee's time be spent in nonadministrative work. The test is not what employees are called, but what they actually did. There is no evidence brought to our attention of compliance with this requirement. Indeed, the only evidence is to the contrary. Appellant Haber testified that about sixty per cent of his time was spent in the nonadministrative function of collecting accounts. (R.T. p. 51.) Ronald Tamillo estimated about eighty per cent of his time was spent on telephone collections or dealing with merchandise. (R.T. p. 589.) Winning estimated that fifty per cent of his time was spent as a telephone collector. (R.T. p. 159.)

In sum, the only evidence as to compliance with 29 C.F.R. § 541.2(d) is that there was no compliance. The court's conclusion that Haber, Ronald Tamillo and Winning were employed in an "administrative capacity" is erroneous and must be reversed.

### III. *The Employee Conspiracies*

■ There was ample evidence that some employees in the collection department were engaged in conspiracies to defraud Americana. We deal with the evidence as to each appellant on the counterclaim.

### A. *Haber*

There is evidence to sustain a finding that Haber participated in the schemes to misappropriate Americana property. Alterations of records were on occasion done "under the direction of Mr. Haber." (R.T. p. 1597, lines 2–3). " * * * [H]e is the one who showed me how to do it." (R.T. p. 1597, line 8.)

"Q. How many conversations did you have with Mr. Haber regarding the false entries on these ledger cards?

"A. Toward the end of every month, I would say the last week of every month that I was there, this happened when I was working in Mr. Haber's section." (R.T. p. 1601, lines 3–7.)

There was no error in the court's finding that Haber had misappropriated funds from Americana.

### B. *Moen*

Moen's participation in the alteration of records was likewise supported by the evidence.

"Q. Did you ever see anyone else make any change of due dates or change of payment dates in the activity book?

"A. Yes. It was Bob Moen, who was in John Winning's section; myself being in Ed Haber's section.

"Q. Did you ever have any discussions with Mr. Moen about these changes?

"A. Yes, many times.

"Q. And what did he say and what would you say?

"A. Well, we would discuss it. I was quite friendly with Mr. Moen. After work we would be with each other and would be just talking, I would say, 'How many payments are you short towards this month,' toward the bonuses, which is our 51 per cent?

Well, he said, 'Well, I have to finagle about 27 more payments,' or what have you, on the end of the month, or cancellations on the unidentifiable tickets." (R.T. p. 1599, line 17 to p. 1600, line 6.)

### C. *Ronald Tamillo*

The evidence abounds as to Wayne Tamillo's defalcations. Such evidence is irrelevant, however, on the question of Ronald Tamillo's liability for Americana's losses. Appellee would have us make him liable on the basis of (1) being Wayne Tamillo's brother, (2) testifying favorably to certain appellants at the trial below, and (3) the taking and copying of company records without authorization. The first two grounds are so lacking in substance as to not require discussion. The third is allegedly supported by appellee's reference in its brief to "Rep. Tr. pp. 669, 676, 678–684." We

find no relevance in any of the three references. Page 669 refers to a "table of organization," offered in evidence, but received, marked as "Ex. Q., *for Identification only*." Page 676 refers to Exhibit PP, also not in evidence, but marked "*for Identification only*." Pages 678 to 684 refer to "Exhibit R, for Identification only"; and not in evidence; and "Exhibit S," which *was* received in evidence. It is a group of seven applications for employment, wherein it is shown that the applicants were interviewed and rated by Ronald Tamillo. No reference is made to any of these applications having been "unauthorizedly taken or copied," and we fail to see their relevancy or that they support appellee's statement.

The proffered proof does not amount to the "full, clear and satisfactory proof" required to establish conspiracy and fraud. See Stevenson v. Stevenson, 36 Cal.App.2d 494, 502, 97 P.2d 982 (1940).

We might speculate that the trial court was swayed by all the evidence against "Mr. Tamillo". Such evidence cannot sustain a judgment, however, unless it is related to Ronald Tamillo in particular. As to Ronald Tamillo the judgment on the counterclaim must be reversed.

### D. *Winning*

As in the case of Ronald Tamillo, there is a complete absence of any evidence as to participation in any scheme by Winning.

After Winning and others had been discharged, the group visited a local tavern (LeRoy's) where a conversation as to Mr. Tamillo (presumably Wayne) took place.

"Q. And did you have a conversation with them at LeRoy's?

"A. There was—yes, we did. There was Mr. Winning, Mr. Haber, myself,

Bob Moen, Joseph Temple. I guess that is the amount of people that were there, and Mr. Haber stated, 'I can hang that so-and-so, if I really wanted to.'

And Mr. Winning stated, 'Well, do it,' because they did not like Mr. Tamillo.

And Mr. Haber's exact words is 'If I hang him, I am hanging myself.' He says, 'I can't do it.'" (R.T. p. 1624, lines 4–13.)

This conversation might reflect Haber's participation, but it does not involve Winning. As to Winning it reflects little more than anger at being terminated, which is far from enough to sustain the judgment against him.[2] The judgment against Winning must be reversed. Causey v. United States, 352 F. 2d 203 (5th Cir. 1965).

### E. *Sisson*

There is ample evidence that Sisson was another employee engaged in cheating Americana. For example:

"Q. Did you ever receive any money from Mr. Sisson?

"A. Just on padding the expense account. Other than that, that was it." (R.T., p. 1612, lines 21–23.)

He was also involved in the scheme of buying new books at the old book prices. (R.T. p. 1611, lines 11–23.) There was no error in including Sisson in the judgment on the counterclaim.

■ As to the amount assessed by the court below as damages, we are at a loss to discern any reasonable basis for the amount selected, $77,400. Appellee offers some speculations and guesses to suggest that the court's award was less than it might have been.[3] That is not enough.

---

2. The only other reference to Winning is the testimony that Moen, one of Winning's subordinates, falsified certain records. Needless to say this, without more, is not evidence against Winning.

3. Americana's estimate, based on Lenay's testimony, was the loss of 100 accounts per month. There was, by estimate, an average balance of $100 to $150 in each account. Thus Americana asserts that

The judgment of the court below is set aside. The case is remanded with instructions to:

(1) Ascertain the amount of overtime worked by appellants and the compensation due thereon;

(2) Ascertain and fix the actual amount of damages suffered by Americana arising from the misappropriations and defalcations of all alleged conspirators; and

(3) Dismiss the counterclaim as to cross-defendants Ronald Tamillo and Winning.

it was losing $10,000 per month. There is no evidence that Americana could reasonably expect to recover 100% of each of these delinquent accounts. But even the $10,000 per month figure is unrelated to the award of the court.